IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-43

No. 149A21

Filed 18 March 2022

IN THE MATTER OF: T.B.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from an order entered on 12 January 2021 by Judge Donald R. Cureton, Jr., in the District Court, Mecklenburg County. This matter was calendared in the Supreme Court on 18 February 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Laura Kaiser Anderson for petitioner-appellee Mecklenburg County Department of Social Services.*

*Chelsea K. Barnes for appellee Guardian ad Litem.*

*Anné C. Wright for respondent-appellant mother.*

*Peter Wood for respondent-appellant father.*

HUDSON, Justice.

¶ 1    Respondent-mother and respondent-father appeal from the trial court's order terminating their parental rights to their minor child T.B. (Tammy).[1] Upon review, we affirm.

---

[1] A pseudonym is used to protect the identity of the juvenile and for ease of reading.

## I.    Factual and Procedural Background

On 17 January 2019, Mecklenburg County Department of Social Services Youth and Family Services Division (YFS) filed a juvenile petition alleging that one-year-old Tammy was neglected and dependent, obtained nonsecure custody of Tammy, and moved her to a foster placement. The petition alleged YFS received a referral reporting that police were called to the family's home on 9 January 2019 in response to a domestic violence incident that occurred in Tammy's presence, resulting in respondent-father's arrest. Respondent-father was combative with police and was charged with assault on a female, injury to personal property, possession of marijuana, resisting arrest, and malicious conduct by a prisoner. Respondent-mother told a magistrate that the charges related to her were fabricated and paid a bondsman to secure respondent-father's release on 10 January 2019.

The petition further alleged that YFS investigators spoke with respondent-mother and then met with each parent separately on 11 January 2019. Respondents denied engaging in domestic violence and claimed a maternal aunt assaulted respondent-mother on 9 January 2019. However, respondent-mother admitted that respondent-father sometimes got jealous when she spoke to other men and told YFS she would have left respondent-father previously if she had more family support. Respondent-father acknowledged possible mental health needs. He also indicated he was previously involved with domestic violence treatment through NOVA but

minimized any continued domestic violence between him and respondent-mother. Although respondent-mother indicated she and respondent-father were still living together as a couple, respondent-father told YFS that he was willing to leave the home as had been suggested by his probation officer. Both parents also admitted to smoking marijuana.

¶ 4 As a result of their meetings with YFS, respondents agreed to submit to random drug screens and substance abuse assessments by 15 January 2019. Respondent-father agreed to go to Monarch for a mental health assessment by 15 January 2019, and respondent-mother agreed to contact the YFS domestic violence liaison by 15 January 2019. However, at the time the petition was filed, neither respondent had followed through with these agreements.

¶ 5 YFS further alleged that other witnesses reported ongoing substance abuse and domestic violence between respondents and concerns about respondent-father's temper, prior domestic violence, and respondent-father's excessive control over respondent-mother. The family's child protective services history included a referral for domestic violence and substance abuse after a similar prior incident.

¶ 6 Respondents participated in mediation on 14 February 2019 and agreed to certain facts consistent with the petition's allegations.

¶ 7 After a hearing on 11 March 2019, the trial court entered an order adjudicating Tammy a neglected and dependent juvenile on 25 April 2019. In addition to adopting

the stipulated facts, the court made findings based on evidence of respondent-father's criminal record, which included a conviction of assault on a government official and a term of probation in which he was twice terminated from a required batterer's intervention program—once for excessive absences and once for a new assault charge. The court specifically found that respondents' "intimate partner violence and substance abuse" led to Tammy's adjudication, and ordered respondents to comply with their mediated family services agreement (FSA). The FSA required respondent-mother to attend domestic violence classes, participate in substance abuse services recommended from her assessment, sign releases for YFS to monitor her progress, and work with YFS to identify supportive individuals and reconnect with family. The FSA required respondent-father to avoid domestic disputes and reengage in NOVA classes once eligible, attend recommended substance abuse services and submit to random drug screens, complete a mental health assessment and comply with recommended services, and sign releases for YFS to monitor his progress. The court ordered the child to remain in YFS custody. Respondents were ordered to attend separate supervised visitations with Tammy a minimum of two times per week.

¶ 8        Following a review hearing on 28 May 2019, the court entered an order on 8 July 2019 finding respondents were making progress on the substance abuse component of their FSA. Respondent-father had finished substance abuse classes with no further recommendations and submitted three negative drug screens.

Respondent-mother was expected to complete substance abuse classes at the end of May and had submitted negative drug screens. However, the court's findings demonstrated minimal progress by respondents in addressing domestic violence, as respondent-father was unable to participate in domestic violence programs because of his pending criminal charges, and respondent-mother had not meaningfully engaged in counseling. Respondent-mother had been injured at least twice in domestic violence incidents and then either recanted or minimized the events in which she was injured. At the review hearing, respondent-mother stated that nothing was wrong in the home prior to Tammy's removal, which the court viewed as demonstrating her lack of insight into the removal conditions.

¶ 9     The trial court held a permanency planning hearing on 11 September 2019. In an order entered on 21 October 2019, the court established a primary permanent plan for Tammy of adoption with a secondary plan of reunification with respondent-mother, citing respondents' failure to address their domestic violence issues. Specifically, the court found respondent-father had been charged with another act of domestic violence against respondent-mother on 15 August 2019 and was terminated from the NOVA program for the fourth time. The court expressed its concern about respondent-father's continued control over respondent-mother, who was pregnant, and asked "whether the mother is at a point (or will ever be at a point) where she can be safe and free from violence and abuse." The court found respondents were "acting

in a manner that is inconsistent with the health or safety of the juvenile" and "have failed to address any of the removal conditions in any meaningful way . . . [or] demonstrated that they would be able to meet the juvenile's basic needs."

¶ 10       In a permanency planning order entered on 2 January 2020, the court trial found that respondents were not actively participating in their FSA or cooperating with YFS or the guardian ad litem (GAL), and they had failed to address the removal conditions in any meaningful way. The court found that respondent-father appeared to lack any insight into his past violence and had yet to fully engage in any type of batterer's intervention or anger management program. Respondent-mother was due to give birth to another child within weeks of the hearing but had not sought prenatal care. Although there was some evidence that respondent-mother had separated from respondent-father and had engaged in some domestic violence services, it was unclear how much insight she had gained. The court further found that respondent-mother had not had any contact with Tammy since May 2019, despite YFS "encourag[ing her] to visit and bond with the child[.]" Due to respondents' lack of progress, the court ordered YFS to file a petition to terminate parental rights within 60 days.

¶ 11       On 4 February 2020, YFS filed a motion to terminate respondents' parental rights in Tammy. In its motion, YFS alleged that grounds existed to terminate both parents' parental rights for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) (2021), failure to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2) (2021),

failure to pay a reasonable portion of Tammy's cost of care pursuant to N.C.G.S. § 7B-1111(a)(3) (2021), and dependency pursuant to N.C.G.S. § 7B-1111(a)(6) (2021).

¶ 12 The termination motion was heard on 12 November 2020. On 12 January 2021, the trial court entered an order terminating respondents' parental rights in Tammy. The court concluded that all four of the grounds alleged in the motion existed to terminate both respondents' parental rights, and that it was in Tammy's best interests to terminate their rights. *See* N.C.G.S. § 7B-1110(a) (2021). Both respondents appealed.

## II. Analysis

### A. Respondent-Mother's Appeal

¶ 13 On appeal, respondent-mother challenges the trial court's adjudication of the existence of grounds to terminate her parental rights.

> When reviewing the trial court's adjudication of grounds for termination, we examine whether the court's findings of fact are supported by clear, cogent and convincing evidence and whether the findings support the conclusions of law. Any unchallenged findings are deemed supported by competent evidence and are binding on appeal. The trial court's conclusions of law are reviewed de novo.

*In re Z.G.J.*, 378 N.C. 500, 2021-NCSC-102, ¶ 24 (cleaned up). "[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395 (2019).

¶ 14 A trial court may terminate parental rights pursuant to N.C.G.S. § 7B-

1111(a)(1) for neglect if it determines the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. A neglected juvenile is defined, in relevant part, as one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2021).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841 (2020) (cleaned up). "A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. 865, 870 (2020) (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018)). "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*." *In re Z.G.J.*, 378 N.C. 500, 2021-NCSC-102, ¶ 26 (quoting *In re Ballard*, 311 N.C. 708, 715 (1984)).

The trial court concluded that grounds existed to terminate respondent-mother's parental rights for neglect based on Tammy's prior adjudication as a neglected juvenile and its determination that "there remains a likelihood of repetition

of such neglect." In addition to describing the circumstances leading to Tammy's prior adjudication as neglected and dependent and the requirements of respondents' FSAs, the court made findings about respondent-mother's progress in addressing the issue of domestic violence, her failure to visit and contact Tammy, and her living situation at the time of the termination hearing.

¶ 16        The findings show that respondent-mother remained in a relationship with respondent-father even after he inflicted additional violence upon her and their unborn child in August 2019, which resulted in criminal charges against respondent-father. Respondent-mother did not cooperate when she was served with a subpoena to appear for respondent-father's criminal court date, and the charges against respondent-father were dismissed. The court found that respondent-mother availed herself of domestic violence services through the Women's Commission and completed group classes in January 2020. However, after respondent-father answered a YFS phone call made to respondent-mother in January 2020 following the birth of Tammy's sister, the trial court ordered respondent-mother to return to the Women's Commission to complete additional domestic violence treatment because she lacked the insight needed to end the relationship and provide a safe environment for herself and her children. The court found that respondent-mother remained in a romantic relationship with respondent-father until August 2020, just months before the November 2020 termination hearing, and that respondent-father showed the social

worker text messages in October 2020 "confirming that he was still in a relationship with [respondent-]mother." The trial court's findings show that respondent-mother had a history of recanting allegations against respondent-father, and the court found respondent-mother's denial of a relationship with respondent-father in the summer of 2020 was not believable. The trial court's findings additionally show that respondent-mother had only contacted the Women's Commission to reengage in services approximately two weeks before the termination hearing, and that she was scheduled to start those services after the termination hearing.

¶ 17        In addition to the findings related to domestic violence, the trial court found that respondent-mother's last contact with Tammy was in May 2019, respondent-mother had not sent cards or gifts to Tammy, respondent-mother had contacted the foster parents "a few times" between August 2019 and February 2020 to check on Tammy but had not requested visits despite being allowed to do so, and respondent-mother had not requested a court hearing to address visitation after the YFS social worker expressed concern about respondent-mother's request to see Tammy after the termination motion was filed on 4 February 2020. Lastly, the trial court found that respondent-mother was living in the same bedroom as her mother in a four-bedroom apartment designed for college students, which they shared with other residents. The court's findings show respondent-mother acknowledged Tammy could not live in the apartment due to the lack of space but indicate she did not have imminent plans to

move out of the apartment.

On appeal, respondent-mother only challenges findings regarding her relationship with respondent-father and her denial of past domestic violence.[2] She first challenges findings of fact 36 and 38 about her continued relationship with respondent-father until August 2020 and the court's determination that her denial of the relationship was not believable. Respondent-mother argues that the evidence of a continued relationship in August 2020 was equivocal and therefore did not support the findings. We disagree.

At the termination hearing, the social worker testified that respondent-father met with YFS in October 2020 and confirmed he was in a relationship with respondent-mother "until about August of 2020" based on dated messages with respondent-mother and pictures of the parents at the beach together in July 2020. Respondent-father also testified at the hearing that he and respondent-mother were together until August 2020, explaining that respondent-mother was living with her mother when they took the beach trip during the summer, he was "trying to patch things up[,]" and they split up at the end of August 2020. Respondent-mother, however, testified her relationship with respondent-father ended before August 2020.

---

[2] Respondent-mother asserts her challenges to the trial court's findings in her argument contesting the adjudication of grounds for termination under N.C.G.S. § 7B-1111(a)(2). Because the findings are also relevant for termination pursuant to N.C.G.S. § 7B-1111(a)(1), we address the challenged findings.

Although she could not precisely recall when it ended, she stated "[i]t ended a long time ago." In reviewing this evidence, we are mindful that it is not this Court's role to reweigh the evidence. *See In re A.U.D.*, 373 N.C. 3, 12 (2019) (noting that the Court "lacks the authority to reweigh the evidence that was before the trial court"). "[I]t is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn from the testimony." *In re T.N.H.*, 372 N.C. 403, 411 (2019) (citing *In re D.L.W.*, 368 N.C. 835, 843 (2016)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019). Under these standards, we hold that the testimony by the social worker and respondent-father support the trial court's finding that respondent-mother continued in a relationship with respondent-father until August 2020. Respondent-mother's argument challenging the findings is overruled.

¶ 20    Respondent-mother also challenges finding of fact 37, which provides that "[o]n two other occasions [respondent-]mother told police [respondent-]father hit or assaulted her. Afterwards, she told [the social worker] and the court that what the police reported is not correct." She contends the finding is not supported by any evidence and is unhelpful as there is no finding as to when the events described took place. To the extent the trial court found that it was respondent-mother who reported

domestic violence to police, we agree that the finding is not supported by the record evidence and disregard the finding. *See In re L.H.*, 378 N.C. 625, 2021-NCSC-110, ¶ 14 (disregarding factual findings not supported by the record). However, there is evidence of at least two instances of domestic violence between respondents that were reported to police, and evidence that respondent-mother denied the domestic violence. Specifically, the evidence shows respondent-mother denied that respondent-father was involved in the incident that resulted in the filing of the juvenile petition in January 2019, and the trial court later found in the 8 July 2019 review hearing order that "the [respondent-mother] has been injured at least twice and then recanted/minimized the events where she was injured[,]" adding that "[h]er inability to fully acknowledge the scope/severity of abusive actions led to the removal." We uphold finding of fact 37 to the extent the trial court found that respondent-mother denied reported instances of domestic violence. We also agree with YFS that the finding is relevant to the determination of a likelihood of future neglect as it demonstrates respondent-mother's lack of insight and propensity to minimize domestic violence, a concern echoed throughout the trial court's findings.

¶ 21 Respondent-mother does not specifically challenge any other findings of fact. The trial court's unchallenged findings are binding on appeal. *See Z.G.J.*, 378 N.C. 500, 2021-NCSC-102, ¶ 24.

¶ 22 Respondent-mother next acknowledges that Tammy was previously

adjudicated neglected but argues that "there was not a sufficient showing of a likelihood of future neglect to uphold termination of [her] parental rights on this ground." Rather, she contends that she made substantial progress on her case plan such that the original removal conditions of substance abuse and domestic violence were not likely to cause a repetition of neglect.

¶ 23      Respondent-mother first addresses substance abuse. She asserts that she had completed a substance abuse course, she was engaged in counseling that included a substance abuse component at the time of the termination hearing, and there was no evidence or findings to show that substance abuse rendered her unable to parent Tammy. However, we see no indication that the trial court relied upon concerns about ongoing substance abuse by respondent-mother as the basis for adjudicating grounds for terminating her parental rights. The court's few findings on the issue credit respondent-mother with "a negative drug screen and breathalyzer sample" the day before the termination hearing and note she was "enrolled in counseling through Family First" and "has not provided a positive drug screen since July 2020." While we agree with respondent-mother that these findings do not tend to show a likelihood she would neglect Tammy in the future, their presence in the trial court's order does not undermine its adjudication, which was based on other findings.

¶ 24      Respondent-mother also argues that "[d]omestic violence was also not likely to lead to further neglect" because the last incident of domestic violence occurred more

than a year before the termination hearing, she had not been in a relationship with respondent-father "for at least several months[,]" and she believed that she had learned from domestic violence classes and had acknowledged that Tammy's exposure to domestic violence was traumatizing. She likens her case to *In re K.L.T.*, 374 N.C. 826 (2020). We are not persuaded.

¶ 25        In *K.L.T.*, this Court reversed the termination of a mother's parental rights on grounds of neglect, distinguishing the case from "past cases involving families with a history of domestic violence, [in which] this Court has determined that a continued likelihood of future neglect is present when the parent continues to participate in domestic violence, fails to truly engage with her counseling or therapy requirements, or fails to break off the relationship with the abusive partner." *Id.* at 846. The mother in *K.L.T.* moved out of the home and separated from the child's abusive father soon after the child's removal from the home, obtained and renewed a DVPO against the father, divorced and ceased all contact with the father, avoided any further incidents of domestic violence after the separation, fully completed all therapy and counseling courses required by her case plan, and devoted hours to writing a detailed safety plan in anticipation of regaining custody of her child. *Id.* at 829, 832, 846–47. Additionally, the mother had acquired housing that was appropriate for the child, consistently visited with the child, and made efforts to be involved in the child's life. *Id.* at 832. It was the combination of all the mother's progress that led this Court to hold "[t]he

trial court's finding of a likelihood of repetition of neglect in the future crosse[d] the line separating a reasonable inference from mere speculation." *Id.* at 847.

¶ 26 The facts here are distinguishable from *K.L.T.* The evidence and findings here show repeated domestic violence and respondent-mother's tendency to minimize it. Respondent-mother did not immediately end the relationship and separate from respondent-father upon the initial adjudication but instead continued the relationship for much of the case despite continued domestic violence and her completion of domestic violence classes. Although the trial court's findings indicate that respondent-mother's relationship with respondent-father had ended several months before the termination hearing, respondent-mother had not completed the required domestic violence treatment. The findings show that respondent-mother was willing to reengage in treatment, "wants to be a role model for her children[,] and believes the [domestic violence] classes will help her learn not to make the same mistakes." However, respondent-mother had only contacted the Women's Commission weeks before the termination hearing to reengage in additional domestic violence treatment required by the court to address its concern that she lacked the insight needed to provide a safe environment for her children, and she had not yet started that treatment at the time of the termination hearing. The trial court's findings on the history of domestic violence and respondent-mother's failure to complete the additional treatment to gain insight needed to provide a safe home for

Tammy support the conclusion that there was a likelihood of repetition of neglect. *See In re D.M.*, 375 N.C. 761, 779 (2020) (upholding a conclusion that there was a likelihood of future neglect due to domestic violence despite no recent reported incidents because there was an extensive history of domestic violence, and the mother failed to complete recommended domestic violence counseling and lacked meaningful insight about the impact of domestic violence on the children).

Furthermore, the trial court's findings show that respondent-mother had not visited or contacted Tammy since May 2019 (a period of eighteen months at the time of the termination hearing), had not requested visitation from the foster parents despite being allowed to do so, and had not sent Tammy any cards or gifts. Respondent-mother requested to see Tammy following the filing of the termination motion, but she took no further action when YFS responded with concern that she had not seen the child in over a year. We have recognized a parent's "pattern of inconsistent contact and lack of interest" in a child as indicative of a likelihood of future neglect for purposes of N.C.G.S. § 7B-1111(a)(1). *In re W.K.*, 379 N.C. 331, 2021-NCSC-146, ¶ 10; *see also In re M.Y.P.*, 378 N.C. 667, 2021-NCSC-113, ¶ 20 (considering a parent's inconsistent visitation among the factors that supported trial court's determination that there was a high probability of repetition of neglect). Respondent-mother also lacked housing appropriate for Tammy at the time of the hearing.

We conclude that the trial court's findings related to ongoing concerns with respondent-mother's progress in addressing domestic violence, together with the unchallenged findings that respondent-mother made minimal efforts to remain in contact and develop a relationship with Tammy and lacked appropriate housing, support the trial court's determination that there is a likelihood of repetition of neglect. Combined with Tammy's prior adjudication as a neglected juvenile, this likelihood of further neglect if the child were returned to respondent-mother's custody supports the trial court's conclusion that grounds existed to terminate respondent-mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1).

Having determined the trial court did not err in adjudicating the existence of grounds for termination of respondent-mother's parental rights in Tammy, and because respondent-mother does not challenge the trial court's determination that termination of her parental rights was in Tammy's best interests, we affirm the trial court's order terminating respondent-mother's parental rights.

**B. Respondent-Father's Appeal**

Counsel for respondent-father has filed no-merit brief on his behalf pursuant to N.C. R. App. P. 3.1(e). There, counsel identified issues that could arguably support an appeal but explained why he found that those issues either lacked merit or would not alter the ultimate result. Counsel also advised respondent-father of his right to file *pro se* written arguments on his own behalf and provided him with the documents

necessary to do so. Respondent-father has not submitted any written arguments to this Court.

We have independently reviewed the issues identified in the no-merit brief submitted by respondent-father's counsel under Rule 3.1(e). *In re L.E.M.*, 372 N.C. 396, 402 (2019). Upon careful consideration of those issues in light of the entire record, we are satisfied that the trial court's 12 January 2021 order terminating respondent-father's parental rights in Tammy was supported by competent evidence and based on proper legal grounds. Accordingly, we affirm the termination of respondent-father's parental rights in Tammy.

## III.    Conclusion

The trial court's 12 January 2021 order terminating respondent-mother's and respondent-father's parental rights in Tammy is affirmed.

AFFIRMED.